United States Court of Appeals

For the Eighth Circuit

_____

No. 22-2870
_____

United States of America,

*Plaintiff - Appellee*,

v.

Edell Jackson,

*Defendant - Appellant.*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: May 11, 2023
Filed: June 2, 2023
_____

Before SMITH, Chief Judge, COLLOTON and BENTON, Circuit Judges.
_____

COLLOTON, Circuit Judge.

Edell Jackson appeals his conviction for unlawful possession of a firearm as
a previously convicted felon. He argues that the district court[1] erred when it
instructed the jury on the elements of the offense, and when it responded to two

_____

[1]The Honorable Donovan W. Frank, United States District Judge for the
District of Minnesota.

questions from the jury during deliberations. He also contends that he had a constitutional right under the Second Amendment to possess a firearm as a convicted felon. We affirm the judgment.

I.

In January 2021, police officers responded to a report of "shots fired" in Brooklyn Center, Minnesota. The officers were informed that a suspect was located in a parking lot in nearby Minneapolis. When the officers arrived at the parking lot, they observed Jackson sitting in a parked vehicle, next to a snowbank. Two law enforcement vehicles drove forward and pinned Jackson's vehicle against the snowbank. Jackson fled his vehicle, shed his jacket while he ran from the officers, but eventually was apprehended. The officers later found a Bersa Thunder nine millimeter handgun in Jackson's jacket pocket.

Before this arrest, Jackson had sustained two convictions in Minnesota for sale of a controlled substance in the second degree in 2011 and 2012, respectively. *See* Minn. Stat. § 152.022.1(1). Jackson was sentenced to 78 months' imprisonment for the first conviction, and 144 months for the second, and was released from state prison in 2017. After the incident in Minneapolis where a handgun was found in Jackson's pocket, a federal grand jury charged him with unlawful possession of a firearm as a previously convicted felon. *See* 18 U.S.C. § 922(g)(1).

The case proceeded to trial. Jackson testified that after he was released from state prison, he was on parole for three years until he was discharged in August 2020. He testified that when he was discharged, his parole officer brought him discharge papers to sign. According to Jackson, the parole officer told him that his rights had been restored, and that he was able to register to vote and "do everything else as a productive citizen of society." Jackson also testified that his parole officer did not give him specific instructions on whether he could possess firearms. Jackson claimed

-2-

that he believed based on these communications that his right to possess firearms had been restored.

The government introduced a copy of Jackson's discharge papers, entitled "Notice of Sentence Expiration and Restoration of Civil Rights." The document provides that "your civil rights have been restored," which "includes a restoration of your right to vote in Minnesota." But the document also states that "if you have been convicted of a Crime of Violence under Minn. Statute § 624.712 subd. 5, you cannot ship, transport, possess or receive a firearm for the remainder of your lifetime."

The jury returned a guilty verdict. Before sentencing, Jackson moved to dismiss the indictment based on the Second Amendment in light of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). He argued that the felon-in-possession statute, § 922(g)(1), is unconstitutional on its face and as applied to him. The district court denied the motion and sentenced Jackson to a term of 108 months' imprisonment.

II.

Jackson first argues that the district court erred when it instructed the jury on the elements required for a conviction under 18 U.S.C. § 922(g)(1). We review the district court's formulation of the jury instructions for abuse of discretion, and its interpretation of the law *de novo*. *United States v. Haynie*, 8 F.4th 801, 804 (8th Cir. 2021).

A conviction under § 922(g)(1) requires the government to prove that (1) the defendant sustained a previous conviction for a crime punishable by a term of imprisonment exceeding one year, (2) he knowingly possessed a firearm, and (3) he knew that he belonged to a category of persons prohibited from possessing a firearm, and (4) the firearm was in or affecting interstate commerce. *See Rehaif v. United*

*States*, 139 S. Ct. 2191, 2200 (2019); *United States v. Coleman*, 961 F.3d 1024, 1027 (8th Cir. 2020).

The district court instructed the jury that the government must prove the following elements:

> One, the defendant has previously been convicted of a crime punishable by imprisonment for more than one year;

> Two, after that, the defendant knowingly possessed a firearm, that is a Bersa model Thunder 9mm semi-automatic pistol bearing serial number E17838;

> Three, at the time the defendant knowingly possessed the firearm, he knew he had been convicted of a crime punishable by imprisonment for more than one year; and

> Four, the firearm was transported across a state line at some time during or before the defendant's possession of it.

The court instructed that under Minnesota law, the sale of a controlled substance in the second degree is a crime punishable by imprisonment for more than one year. *See* Minn. Stat. § 152.022.1(1), (3). The court further explained that when an offender is convicted of this drug offense, the State of Minnesota "does not permit the full restoration of the defendant's civil rights insofar as he was not permitted to ship, transport, possess, or receive a firearm for the remainder of his lifetime." *See* Minn. Stat. §§ 609.165(1), 624.712(5). The court also instructed the jury as follows:

> For you to find that element number three is proved beyond a reasonable doubt, you must unanimously agree that the defendant knew he had been convicted of a crime punishable by imprisonment for more than one year at the time he knowingly possessed the firearm described in the

-4-

Indictment. *In making that determination, you may consider whether the defendant reasonably believed that his civil rights had been restored, including his right to possess a firearm.*

R. Doc. 65, at 15 (emphasis added).

Jackson contends that the court abused its discretion when it instructed the jury on the first element of the offense—that the defendant had been convicted of a crime punishable by more than a year of imprisonment. He relies on the fact that a prior conviction does not qualify under § 922(g)(1) if the conviction "has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored . . . unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." *Id.* § 921(a)(20).

Jackson contends that the court should have provided the jury with the statutory language from § 921(a)(20), and allowed the jury to decide whether his right to possess a firearm had been restored. Jackson's argument is foreclosed by *United States v. Stanko*, 491 F.3d 408 (8th Cir. 2007), which held that whether a predicate conviction satisfies the criteria under § 921(a)(20) is "a question of law for the court rather than one of fact for the jury." *Id.* at 412; *see United States v. Boaz*, 558 F.3d 800, 805 (8th Cir. 2009). Therefore, the district court did not abuse its discretion when it instructed the jury on the first element of the offense.

Jackson next challenges the district court's instruction on the third element of the offense regarding knowledge. Although the instructions permitted the jury to consider whether Jackson reasonably believed his rights were restored, he maintains that the language should have required the jury to do so by using the phrase "must consider." But Jackson himself proposed to instruct the jury that it "may consider" whether he reasonably believed his rights had been restored. The court incorporated

his suggestion into the final instructions. Because Jackson requested the precise language about which he now complains, any error was invited, and his objection is waived. *United States v. Defoggi*, 839 F.3d 701, 713 (8th Cir. 2016).

Even if Jackson's objection were not waived, the claim of error was forfeited, and we would review at most for plain error. *United States v. Reed*, 636 F.3d 966, 970 (8th Cir. 2011). Jackson cannot meet this standard, because the instruction on the third element was not obviously wrong. *See United States v. Olano*, 507 U.S. 725, 734 (1993). *Rehaif* held that in a prosecution under § 922(g), "the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." 139 S. Ct. at 2200. Jackson was barred because he had been convicted of a crime punishable by imprisonment for more than one year, *see* 18 U.S.C. §§ 922(g)(1), 921(a)(20), and his right to possess had not been restored. Minn. Stat. §§ 609.165(1), 624.712(5).

Consistent with *Rehaif*, the jury instructions required the government to prove that Jackson "knew he had been convicted of a crime punishable by imprisonment for more than one year." Jackson contends that the instruction was flawed because it did not require the jury to find that he knew he was *still* a prohibited person at the time of the charged offense, despite a possible restoration of rights. But the instructions further provided that in making the determination about knowledge, the jury may consider whether Jackson reasonably believed that his right to possess a firearm had been restored. The instruction thus allowed Jackson to argue, and a jury to find, that he lacked the requisite knowledge due to a belief that his rights had been restored. Jackson cites no authority that the instruction as formulated was plainly erroneous.

Jackson also argues that the district court erred when it responded to two questions from the jury during its deliberations. We review a district court's decision

on whether to supplement jury instructions for abuse of discretion. *United States v. White*, 794 F.2d 367, 370 (8th Cir. 1986).

The jury first inquired about the court's instruction on the third element of the offense. The question asked for "clarification" on a sentence in the instructions that stated: "In making that determination, you may consider whether the defendant reasonably believed that his civil rights had been restored, including his right to possess a firearm." The court responded: "It is one issue that you may consider in evaluating whether the government has proven element #3 beyond a reasonable doubt." Jackson agreed to the response, telling the court that "I don't have any objection." Jackson therefore waived his objection to the court's supplemental instruction. *See United States v. Davis*, 826 F.3d 1078, 1082 (8th Cir. 2016).

The jury asked a second question: "Does the defendant believing that his civil rights had been restored, AND knowing that he had been convicted of a crime punishable by imprisonment for more than one year translate to having proven" element three of the offense. The court responded that "[t]his is a question that you must decide based on the evidence before you and my instructions." Jackson objected to the court's response, and urged the court to answer "no."

Jackson argues that the jury's question suggests that it did not understand the instructions, and may have convicted him despite his asserted belief that his right to possess a firearm had been restored. He contends that the court abused its discretion by not supplementing the instructions to "cure the jury's misdirection." A district court has broad discretion to decide what amplification of the instructions, if any, is necessary. *United States v. Bayer*, 331 U.S. 532, 536 (1947). "The trial judge in the light of the whole trial and with the jury before him may feel that to repeat the same words would make them no more clear, and to indulge in variations of statement might well confuse." *Id*. Here, the jury's question effectively asked the court to direct the jury whether a particular element of the offense had been proved under a

hypothetical set of assumptions. The question, moreover, did not align with the original instructions, because it referred to the defendant "believing that his civil rights had been restored" without the qualification that the belief was "reasonable." The district court permissibly declined to answer the jury's hypothetical and instead properly referred them back to the original instructions. There was no abuse of discretion.

## III.

Jackson also appeals the district court's denial of his motion to dismiss the indictment. He argues that § 922(g)(1) is unconstitutional as applied to him, because his drug offenses were "non-violent" and do not show that he is more dangerous than the typical law-abiding citizen.

We conclude that the district court was correct that § 922(g)(1) is not unconstitutional as applied to Jackson based on his particular felony convictions. The Supreme Court has said that nothing in *District of Columbia v. Heller*, 554 U.S. 570 (2008), which recognized an individual right to keep and bear arms, "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 626; *see McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion). The decision in *Bruen*, which reaffirmed that the right is "subject to certain reasonable, well-defined restrictions," 142 S. Ct. at 2156, did not disturb those statements or cast doubt on the prohibitions. *See id.* at 2157 (Alito, J., concurring); *id*. at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.); *id*. at 2189 (Breyer, J., dissenting, joined by Sotomayor and Kagan, JJ.). Given these assurances by the Supreme Court, and the history that supports them, we conclude that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1).[2]

---

[2]According to published data, a rule declaring the statute unconstitutional as applied to all but those who have committed "violent" felonies would substantially

-8-

History shows that the right to keep and bear arms was subject to restrictions that included prohibitions on possession by certain groups of people. There appear to be two schools of thought on the basis for these regulations. A panel of the Third Circuit recently surveyed the history in light of *Bruen* and concluded that legislatures have longstanding authority and discretion to disarm citizens who are not "law-abiding"—*i.e.*, those who are "unwilling to obey the government and its laws, whether or not they had demonstrated a propensity for violence." *Range v. Att'y Gen.*, 53 F.4th 262, 269 (3d Cir. 2022) (per curiam), *vacated, reh'g en banc granted*, 56 F.4th 992 (3d Cir. 2023). Jackson contends that a legislature's traditional authority is narrower and limited to prohibiting possession of firearms by those who are deemed more dangerous than a typical law-abiding citizen. While the better interpretation of the history may be debatable, we conclude that either reading supports the constitutionality of § 922(g)(1) as applied to Jackson and other convicted felons, because the law "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

Restrictions on the possession of firearms date to England in the late 1600s, when the government disarmed non-Anglican Protestants who refused to participate in the Church of England, Joyce Lee Malcom, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 45 (1994), and those who were "dangerous to the Peace of the Kingdom," Militia Act of 1662, 13 & 14 Car. 2 c. 3, § 13. Parliament later forbade ownership of firearms by Catholics who refused to renounce their faith. An Act for the Better Securing the Government by Disarming Papists and Reputed

---

invalidate the provision enacted by Congress. The most recent available annual data show that only 18.2 percent of felony convictions in state courts and 3.7 percent of federal felony convictions were for "violent offenses." Sean Rosenmerkel et al., *Felony Sentences in State Courts, 2006 – Statistical Tables* 3 tbl.1.1 (revised Nov. 2010), https://bjs.ojp.gov/content/pub/pdf/fssc06st.pdf; Mark Motivans, *Federal Justice Statistics, 2021*, at 12 tbl.7 (Dec. 2022), https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/fjs21.pdf.

Papists, 1 W. & M., Sess. 1, c. 15 (1688). The English Bill of Rights established Parliament's authority to determine which citizens could "have arms . . . by Law." An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown, 1 W. & M., Sess. 2, c. 2, § 7 (1689)); *see Bruen*, 142 S. Ct. at 2141-42.

In colonial America, legislatures prohibited Native Americans from owning firearms. Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794*, 16 Law & Hist. Rev. 567, 578-79 (1998); *see also* Act of Aug. 4, 1675, 5 *Records of the Colony of New Plymouth* 173 (1856); Act of July 1, 1656, *Laws and Ordinances of New Netherland* 234-35 (1868). Religious minorities, such as Catholics in Maryland, Virginia, and Pennsylvania, were subject to disarmament. Bellesiles, *supra*, at 574; Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020). In the era of the Revolutionary War, the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to declare an oath of loyalty. *See 4 Journals of the Continental Congress*, 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906); Act of Mar. 14, 1776, ch. 21, 1775-76 Mass. Acts 479; Act of May 1777, ch. III, 9 *The Statutes at Large; Being a Collection of all the Laws of Virginia* 281-82 (1821); Act of June 13, 1777, ch. 756 §§ 2-4, 1777 Pa. Laws 110, 111-13; Act of June 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862); Act of Nov. 15, 1777, ch. 6, 1777 N.C. Sess. Laws 231; Act of Sept. 20, 1777, ch. XL, 1777 N.J. Laws 90; *see also* Joseph Blocher & Caitlan Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders* 5 & nn. 38-41 (Duke L. Sch. Pub. L. & Legal Theory Series No. 2020-80), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3702696.

The influential "Dissent of the Minority," *see Heller*, 554 U.S. at 604, published by Anti-Federalist delegates in Pennsylvania, proposed that the people should have a right to bear arms "unless for crimes committed, or real danger of

public injury from individuals." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971). Early legislatures also ordered forfeiture of firearms by persons who committed non-violent hunting offenses, *see* Act of Oct. 9, 1652, *Laws and Ordinances of New Netherland* 138 (1868); Act of Apr. 20, 1745, ch. III, 23 *The State Records of North Carolina* 218-19 (1904); and they authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property. *See* An Act for the Punishment of Certain Crimes Against the United States, Pub. L. No. 1-9, § 14, 1 Stat. 112, 115 (1790); Act of Feb. 21, 1788, ch. 37, 1788 N.Y. Laws 664-65; Act of May 1777, ch. XI, 9 *The Statutes at Large; Being a Collection of all the Laws of Virginia* 302-03 (1821); *A Digest of the Laws of Maryland* 255-56 (1799); Stuart Banner, *The Death Penalty: An American History* 3, 18, 23 (2002); John D. Bessler, *Cruel & Unusual: The American Death Penalty and the Founders' Eighth Amendment* 56-57 (2012); Kathryn Preyer, *Penal Measures in the American Colonies: An Overview*, 26 Am. J. Legal Hist. 326, 330-32, 342, 344-47 (1982). While some of these categorical prohibitions of course would be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms.

Based on this historical record, the Third Circuit panel in *Range* concluded that legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a threat purportedly posed by these people "to an orderly society and compliance with its legal norms," not merely to address a person's demonstrated propensity for violence. 54 F.4th at 281-82. This conclusion was bolstered by the Supreme Court's repeated statements in *Bruen* that the Second Amendment protects the right of a "law-abiding citizen" to keep and bear arms. *See* 142 S. Ct. at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138, 2150, 2156. As stated by the D.C. Circuit, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019).

-11-

On this view, for which there is considerable support in the historical record, Congress did not violate Jackson's rights by enacting § 922(g)(1). He is not a law-abiding citizen, and history supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society. *See also United States v. Bena*, 664 F.3d 1180, 1183-84 (8th Cir. 2011); *United States v. Adams*, 914 F.3d 602, 610-11 (8th Cir. 2019) (Kelly, J., concurring in the judgment).

If the historical regulation of firearms possession is viewed instead as an effort to address a risk of dangerousness, then the prohibition on possession by convicted felons still passes muster under historical analysis. Not all persons disarmed under historical precedents—not all Protestants or Catholics in England, not all Native Americans, not all Catholics in Maryland, not all early Americans who declined to swear an oath of loyalty—were violent or dangerous persons. The Third Circuit panel understood this fact to mean that the historical justification for regulation was not limited to dangerousness. *Range*, 53 F.4th at 275, 282. But if dangerousness is considered the traditional *sine qua non* for dispossession, then history demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons. Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed. In reasoning by analogy from that history, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Bruen*, 142 S. Ct. at 2132; *see* Blocher & Carberry, *supra*, at 11-12.

Congress enacted an analogous prohibition in § 922(g)(1) to address modern conditions. In the Omnibus Crime Control and Safe Streets Act of 1968, Congress found that there was "widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce," and that "the ease with which any person can acquire firearms other than a rifle or shotgun (including criminals . . ., narcotics addicts,

mental defectives, . . . and others whose possession of such weapons is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States." Pub. L. No. 90-351, § 901(a)(1), (2), 82 Stat. 225, 225. Congress found that "only through adequate Federal control over interstate and foreign commerce in these weapons" could "this grave problem be properly dealt with." *Id*. § 901(a)(3). By prohibiting possession of firearms by convicted felons and others, Congress intended to further this purpose without placing "any undue or unnecessary Federal restrictions or burdens on law-abiding citizens." *Id*. § 901(b). In the Safe Streets Act of 1968 and the Gun Control Act of 1968, Congress also tailored the prohibition on possession of firearms by exempting those convicted of felony offenses "pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices as the Secretary may by regulation designate." *Id*. § 902 (codified at 18 U.S.C. § 921(b)(3)); Pub. L. No. 90-618, 82 Stat. 1213, 1216 (codified at 18 U.S.C. § 921(a)(20)).

The Supreme Court has observed that the purpose of the Safe Streets Act, as amended by the Gun Control Act, was to curb "lawlessness and violent crime." *Huddleston v. United States*, 415 U.S. 814, 824 (1974). The "very structure of the Gun Control Act demonstrates that Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). Congress prohibited "categories of presumptively dangerous persons from transporting or receiving firearms," *Lewis v. United States*, 445 U.S. 55, 64 (1980), because they "pose[d] an unacceptable risk of dangerousness." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 120 (1983). "Congress obviously determined that firearms must be kept away from persons, such as those convicted of serious crimes, who might be expected to misuse them." *Id*. at 119. That determination was not unreasonable.

To be sure, the historical understanding that legislatures have discretion to prohibit possession of firearms by a category of persons such as felons who pose an

unacceptable risk of dangerousness may allow greater regulation than would an approach that employs means-end scrutiny with respect to each individual person who is regulated. But that result is a product of the method of constitutional interpretation endorsed by *Bruen*:

> Indeed, governments appear to have *more* flexibility and power to impose gun regulations under a test based on text, history, and tradition than they would under strict scrutiny. After all, history and tradition show that a variety of gun regulations have co-existed with the Second Amendment right and are consistent with that right, as the Court said in *Heller*. By contrast, if courts applied strict scrutiny, then presumably very few gun regulations would be upheld.

*Heller v. District of Columbia*, 670 F.3d 1244, 1274 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). *Cf. Kanter v. Barr*, 919 F.3d 437, 465 (7th Cir. 2019) (Barrett, J., dissenting) (concluding before *Bruen* that Congress cannot dispossess felons based solely on status, and that "a very strong public-interest justification and a close means-end fit" is required before a felon may be subject to a dispossession statute based on dangerousness) (quoting *Ezell v. City of Chicago*, 846 F.3d 888, 892 (7th Cir. 2017)).[3]

---

[3]A footnote in *Heller* referred to "presumptively lawful regulatory measures" that forbid the possession of firearms by felons and the mentally ill, prohibit the carrying of firearms in sensitive places such as schools or government buildings, and impose conditions and qualifications on the commercial sale of arms. The Court said that it identified these measures "only as examples," and that the list was not exhaustive. 554 U.S. at 627 n.26. Some have taken the phrase "presumptively lawful" to mean that the Court was suggesting a presumption of constitutionality that could be rebutted on a case-by-case basis. That is an unlikely reading, for it would serve to cast doubt on the constitutionality of these regulations in a range of cases despite the Court's simultaneous statement that "nothing in our opinion should be taken to cast doubt" on the regulations. *Id*. at 626; *see supra* n.2. We think it more likely that the Court presumed that the regulations are constitutional because they are

In sum, we conclude that legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms. Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons. Consistent with the Supreme Court's assurances that recent decisions on the Second Amendment cast no doubt on the constitutionality of laws prohibiting the possession of firearms by felons, we conclude that the statute is constitutional as applied to Jackson. The district court properly denied the motion to dismiss the indictment.[4]

*       *       *

For these reasons, the judgment of the district court is affirmed.

---

constitutional, but termed the conclusion presumptive because the specific regulations were not at issue in *Heller*.

[4]In *United States v. Adams*, we said that a defendant raising an as-applied challenge to § 922(g)(1) must show "(1) that the Second Amendment protects his particular conduct, and (2) that his prior felony conviction is insufficient to justify the challenged regulation of Second Amendment rights." 914 F.3d at 605. Jackson argues that his particular conduct of carrying a concealed weapon was constitutionally protected. We need not address that question, because we conclude that the prohibition is constitutional as applied to Jackson regardless of his particular conduct.

-15-

SMITH, Chief Judge, joining in Parts I and II, and concurring in part in Part III and in the judgment.

I concur fully in Parts I and II of the opinion. I concur as to the judgment in Part III and agree that § 922(g)(1) is not unconstitutional as applied to Jackson and that *Heller* remains the relevant precedent we are bound to apply.

_____